UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JERID ENTERPRISES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:10-CV-435 JD |
| | ) | |
| LLOYD'S LONDON; SKELTON & | ) | |
| CARNEGIE INSURANCE | ) | |
| SPECIALTY CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Jerid Enterprises, LLC, ("Jerid") sued defendants Certain Underwriters at Lloyd's, London (incorrectly named as "Lloyd's London") ("Underwriters") and Skelton & Carnegie Insurance Specialty Corporation for policy limits after the roof of a South Bend, Indiana, commercial property owned by Jerid and insured by Underwriters partially collapsed. The dispute centers on the cause of collapse: Jerid's theory is that a lightning strike to a metal drainpipe running from the roof to the floor caused an explosion; Underwriters believe that rotted load-bearing beams or columns collapsed under the weight of standing water on the roof during a torrential rain. If it is the former, the policy provides coverage. If it is the latter, the policy does not. On February 17, 2012, the parties cross-moved for summary judgment on the cause-of-collapse issue. [DE 30; DE 31]. The parties briefed out each motion [DE 32; DE 33; DE 34;[1] DE 35; DE 36; DE 37], and the motions have been taken under advisement. For the reasons stated herein, both parties' motions are

---

[1] DE 34, the plaintiff's response to Underwriters' motion for summary judgment, was initially filed without a certificate of service or a signature page. At DE 35, Jerid re-filed the same document to remedy those omissions.

**DENIED**. The cause-of-collapse issue is a genuine and material factual dispute fit for resolution by a jury.

## STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). The fact that the parties have cross-filed for summary judgment does not change the standard of review. *M.O. v. Indiana Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are typically analyzed separately under the standards applicable to each. *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008). The non-moving party cannot simply rest on the allegations or denials contained in its pleadings. It must present sufficient

evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Furthermore, the non-moving party may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

## BACKGROUND[2][3]

Jerid Enterprises, LLC, is a commercial real estate holdings company formed in 1994 and located in South Bend, Indiana. [DE 30-3 at 11]. The company is a two-man show, owned and operated by William Anksorus and his son, Remington. [DE 30-3 at 12]. In May of 2007, Jerid purchased a parcel composed of six interconnected buildings at 1008 West Sample Street in South Bend. [DE 30-3 at 14]. Effective October 4, 2007, to October 4, 2008, the complex was insured by Underwriters under policy number PUC102400 for up to $300,000. [DE 33-1 at 8]. The policy covered only certain types of losses and excluded others, distinguishing between covered and non-covered losses based on their cause:

A. Coverage

We will pay for direct physical loss of or damage to Covered property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

---

[2] The record is cited in the following format: ["Docket Entry Number" at "page or paragraph number within docket entry"].

[3] When ruling on a motion for summary judgment, the court construes all facts in the light most favorable to the non-movant. *Anderson*, 477 U.S. at 255. In the discussion section of this order, that benefit will be accorded to each party when appropriate, since the parties have cross-moved. In this section, however, the court does not construe factual disputes in either party's favor. Moreover, the inclusion of a fact in this section does not mean that it will be material to the court's ruling; to the contrary, many of these facts prove immaterial. This section is simply intended to provide a comprehensive summary of the case and of the evidence presented to the Court.

[DE 33-1 at 11]. The cause of loss portion of the policy provided that "Covered Cause of Loss" included "Lightning." [DE 33-1 at 25]. However, it also excluded certain causes of loss, including rot:

> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> \* \* \*
>
> h. "Fungus", Wet Rot, Dry Rot and Bacteria
>
> Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

[DE 33-1 at 26-27]. The parties do not dispute the application of these provisions. Both agree that if the collapse was caused by lightning it is covered, and that if it was caused by rot it is not covered. A straightforward reading of the policy confirms as much. That means there is no issue of contract interpretation in this case (at least not at the summary judgment stage). The dispute between the parties is a purely factual one: what caused the partial collapse of Building 5 at the Sample Street complex?

There is a degree of inherent uncertainty surrounding the collapse, because nobody saw it happen. It was discovered after the fact. While parts of the Sample Street complex were used by three tenants for storage during 2008, Building 5 itself was unoccupied. [DE 30-3 at 14]. On or around September 25, 2008, following several severe weather occurrences throughout the month, a neighbor happened to look over towards the complex and noticed that the roof of Building 5 had partially collapsed. [DE 30-3 at 27-28]. The neighbor contacted William Anksorus immediately, and that was the first he heard of it. Anksorus went to the property to survey the damage, and on or about October 1, 2008, he submitted a property loss notice to Underwriters. [DE 30-4 at 1].

4

## The Donan Report

Underwriters contracted with structural engineers from Donan Engineering, Co., Inc., ("Donan") to assess the cause of collapse. Richard Rupnow, a Donan engineer, prepared a causation report and submitted it to the claims adjuster on December 4, 2008. [DE 30-4 at 9-27]. His report was based on his observations during two visits to the site, on October 6, 2008, and November 4, 2008, and included multiple photographs of the site.

The Rupnow Report begins with an assessment of the building structure and condition. Building 5 is located on the west side of a courtyard, which is ringed by the other buildings in the complex. The brick exterior walls of Building 5 showed no damage, but the interior was a mess. The interior was constructed of heavy timber posts and beams; two interior rows of columns divided the building into a grid three bays wide (East-West) by twelve bays long (North-South). The columns were 10-inch by 10-inch on the first and second floors, and 8-inch by 8-inch on the third. Above the third floor sat the roof. On each floor, the columns supported 8-inch by 10-inch timer beams, running east to west, on which a heavy plank floor was constructed. The roof was relatively flat, with drainage via two 6-inch wide interior downspouts running alongside the support columns [DE 33-4 at 15] to a below-grade storm sewer. There were two or three of these downspouts, and one had run down a column at the center of the collapse.

That column was the third column from the south end of the building, on the east row. It had totally collapsed, and the second and fourth columns had partially collapsed, leaving an open hole in the roof. The collapsed columns, beams, floors, and rubble from the roof were hanging into the first floor. The collapsed material was balanced precariously, and Rupnow could not examine the debris pile closely without risking his safety. In addition to the partial collapse, a few other

5

indicators of damage were found. A hasp – a metal latch used to secure a door – was pulled off the door at the north end of the building; the plywood around the door was pulled out of the larger opening; and a wood-framed partition wall farther north in the connected, adjacent building was pushed apart. Back in Building 5, on the west side near the collapsed area, a window pane was broken outwards, leaving glass on the ground exterior to the building.

Rupnow initially considered a number of possible causes for the collapse of the roof: (1) lightning; (2) wind; and (3) rainfall. He ruled out lightning simply because he did not find any damage to Building 5's electrical service, nor any evidence of burns or smoke in the debris pile. He also ruled out wind because no roof membranes or sheathing had been lifted up or blown over the side of the building. To the contrary, the roof membrane fell into the building during the collapse. Rupnow attributed the other indicators of damage – the broken hasp, broken window, etc. – to wind blowing into the hole in the roof after the collapse.

With respect to rainfall, Rupnow noted that South Bend received over 10 inches of rainfall on September 13th and 14th, 2008. He attempted to calculate the amount of standing water which, at a maximum, could have accumulated on the roof during that storm. It is now undisputed that Rupnow's calculations were incorrect, since he assumed a "parapet wall" ran each side of the roof, creating a sort of pool to capture rainfall. In fact, a parapet wall runs only one side of the roof, and accumulated rainwater is free to run off the remaining three sides. In any case, Rupnow determined that the maximum amount of rainwater which could have accumulated was not significant enough to cause the collapse, provided the building was structurally sound. Rupnow hypothesized, however, that the building was *not* structurally sound at the time of collapse. He noticed and photographed a rotted timber – either a column or a beam – at the center of the debris pile, and concluded that "[i]t

is possible that the column at the center of the collapse was rotted and in a weakened condition such that it could not support the normal roof load or the extra load from water from the storm." [DE 30-4 at 12]. Rupnow could not investigate the debris pile further for more signs of rot.

In concluding his report, Rupnow found that "the cause is undetermined, with the most likely cause being the weight of storm water on the roof combined with the long term rot and decay of a supporting element of the structure." Despite the fact that Rupnow plainly stated the cause was undetermined, the claims adjuster promptly informed Jerid that "Donan engineering found the proximate cause of the building collapse to be the weight of the storm water combined with rotting supporting timbers[,]" and denied coverage for the claim. [DE 30-4 at 5].

### Jerid Obtains a Second and Third Opinion

William Anksorus was predictably unhappy with the way the process played out. In January of 2009, he hired his own structural engineer, Jerry Mohajeri, to inspect Building 5 and to determine the cause of collapse. Mohajeri inspected the site in September, 2009, and submitted his report to Anksorus in December, 2009. [DE 30-7; DE 30-9]. Mohajeri generally confirmed Rupnow's observations regarding the structure and condition of Building 5. Like Rupnow, Mohajeri could not investigate the debris pile thoroughly due to safety concerns. Unlike Rupnow, however, he could not see any rotted timbers in the debris pile. He also noticed that elsewhere in the building, a support column had been replaced by two steel pipes, but no evidence of rot was visible in the remaining original portions. Mohajeri's observations also differed from Rupnow's in that he correctly noted that there was no parapet around the roof. The roof showed a slight downgrade (~1/8 inch per foot) towards the roof drains, but any water which accumulated over the amount held in the downgrades and drain basis would splash over the sides.

7

Perhaps most importantly, Mohajeri noticed many bubble-shaped tar pieces on the first floor, where, in his words, "the pitch tar from around the roof drain had melted and stuck to the floor." [DE 30-7 at 2]. Some tar pieces had splintered wood from the roof deck imbedded in them. Mohajeri considered the same possible causes of collapse as Rupnow, but came to a different conclusion. He agreed that the weight of any accumulated rain water would have been insufficient to cause a roof collapse, absent significantly deteriorated load-bearing elements. He also agreed with Rupnow that there was no evidence of wind damage. Unlike Rupnow, he did not find any evidence of rot or decay in any structural elements, nor did he find any evidence of rot in the debris pile, although like Rupnow he could not investigate thoroughly.

The most significant difference in the engineers' conclusions pertained to the possibility of a lightning strike. Mojaheri theorized that the melted, scattered tar pieces could not have resulted from an inward collapse caused by accumulated rainwater and rot. [DE 30-7 at 3]. Mohajeri thought it more likely the tar scatter resulted from a lightning strike to accumulated water on the roof, which could cause "electro-hydraulic effect." In short, that means an electrical discharge would take place below the surface of pooled water on the roof, traveling to the metal roof drains and pipes running thereunder, down to the floor. The electrical surge through the water would quickly heat it to steam, propogating a blast wave at high speeds; in the enclosed drainpipe, this could result in an explosion. Mohajeri pointed to the scattered melted tar, including one piece that was found with a shattered fragment of the drain pipe, as evidence that this is what had occurred. Without high heat, the bubble-shaped tar pieces could not have formed; if they simply broke apart in a collapse, they would have broken edges. Finally, Mohajeri found the other indicators of damage – the damaged partition walls,

8

etc. – to be consistent with what might result from a blast wave generated by the electro-hydraulic effect.

Based on his own observations, Mohajeri concluded that the collapse was not caused by rotted timbers. He found that "[d]ue to a [lightning] strike into the water collected on the roof, a surface discharge [arose] on the boundary surface between roofing material and water[,]" and that "[t]he conductive effect follow[ed] into a bolt through the roofing material, roof drain and associated piping, melting pitch tar around the roof drain." That bolt created a microburst down the drainpipe, resulting in the partial collapse.

Anksorus also obtained an opinion from Peter Gaitan, CEO/President of Archdecom, Inc. [DE 30-5 at 1-3]. Gaitan is not an engineer. His company is in the reclamation or salvage business, and he became interested in the Sample Street complex as an acquisition in mid-2008. As a part of his assessment of the property, Gaitan did a walkthrough, along with a second individual, in August of 2008. He examined the physical structure of the building, looking for any problem areas from water damage, dry rot, or structural integrity issues. The walkthrough took around seven hours to complete. Part of Archdecom's demolition process would involve positioning crews and machinery on the roof, so it was imperative that Gaitain verify the structure was stable. He noted no problems with Building 5.

Gaitan also visited the complex after the collapse. Based on his assessment, Gaitan agreed with Mohajeri that lightning was the most likely cause of collapse. In addition to confirming Mohajeri's observations, Gaitan suggested that the wooden roof planks would have broken into longer pieces in the event of a collapse under the weight of accumulated rainwater on rotting timbers. From what he could see, the roof planks were splintered and destroyed. That was more

9

consistent with a small explosion, of the type a bolt of lightning would generate under the scenario outlined by Mohajeri. Gaitan could not see or locate any evidence of rot, either in the debris pile or elsewhere.

**The Donan Response**

Underwriters, through their attorneys, asked Donan to review and respond to the Mojaheri and Gaitan reports. Rupnow completed that task on February 2, 2010. [DE 33-5]. He reviewed the evidence relied on by Mohajeri and Gaitan in reaching their conclusions. He admitted he calculated the weight of water on the roof incorrectly, as Mohajeri had pointed out. But Rupnow – who has no specialized knowledge regarding lightning or electrical engineering [DE 33-3 at 14] – disagreed that the evidence suggested a lightning strike. He did not believe that the melted tar fragments came from the roof; they were located only on the first floor, and there were no trails in the dirt and dust on the first floor indicating that the tar pieces could have landed on the first floor and then rolled or bounced to their present locations in an explosive event. Rupnow also observed that the tar pieces did not contain any gravel, as would be expected if they came from the roof. Finally, he ran an internet search on the electro-hydraulic effect, with which he was not familiar, and did not find any instances of it occurring under similar circumstances in the past. [DE 33-5 at 7]. Rupnow still believed the most likely cause of collapse was rotted timbers, which collapsed under the weight of accumulated water.

**Additional Evidence**

Underwriters continued to deny Jerid's claim. In addition to the evidence already recounted, Underwriters obtained two "lightning strike reports," one from a provider known as Vaisala, Inc., and one provided by AccuWeather. [DE 33-12 at 8-10; DE 33-13]. Underwriters also contracted

with Gary Woodall, another engineer at Donan – this time a forensic electrical engineer more familiar with the causes and effects of fire and lightning damage – to do a separate analysis of the Building 5 collapse. He visited the site on April 8, 2012. Woodall's observations were consistent with Rupnow's in most respects, but he added new impressions as well. Woodall reported that some of the structural members contained in the debris pile did show signs of moisture damage. [DE 33-10 at 11]. He photographed one particular timber that showed evidence of rot. Woodall also noted – contrary to Rupnow's representation – that some of the "tar bubbles" did include pieces of rock, as would be expected if they came from the roof. [DE 33-10 at 12]. Not all of the tar was on the first floor; at least one piece, which also contained bits of cable and wood fragments, was located under flooring that was still in place on the second floor. Woodall's most significant new discovery was a fragment of a wooden capital – the structural member that sits atop a column and supports a beam – near the debris pile. He collected and photographed the piece, and it showed evidence of extensive rot.

Woodall explained that the lightning strike reports obtained by Underwriters covered only September 13th and September 14th, 2008. On those dates, the only two recorded lightning strikes within a five-mile radius were shown to a 99% degree of probability to have occurred roughly 2 and 2.2 miles north of the Sample Street complex – too far to have impacted Building 5. [DE 33-10 at 12]. Based in part on those reports, Woodall discounted lightning as a possible cause for the collapse. He concluded, like Rupnow, that rot was at the root of it.

**Litigation**

Jerid sued in state court on September 17, 2010. [DE 1]. The complaint was later removed to federal court on diversity jurisdiction grounds. [DE 2]. As discovery progressed, the parties

11

deposed each witness who had expressed an opinion regarding the cause of collapse during the pendency of Jerid's claim. Those depositions are in the record and have been reviewed by the court in conjunction with the remainder of the materials presented. The parties cross-moved for summary judgment on February 17, 2012. [DE 30; DE 31]. Jerid claims that it is entitled to a summary judgment holding that lighting was the cause of the collapse; Underwriters claim they are entitled to summary judgment because Jerid cannot prove lightning was the cause of collapse, and should not be permitted to take its case to a jury. Neither party is correct.

## DISCUSSION

### I. Underwriters' Motion

The Court begins with Underwriters' motion. Underwriters begin by pointing out that, on summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which it will bear the burden at trial." *Celotex Corp.*, 477 U.S. at 322-323. And, under Indiana law, "[a]n insured has the burden of proving coverage under an insurance policy." *Southbend Escan Corp. v. Fed. Ins. Co.*, 647 F.Supp. 962, 966 (N.D. Ind. 1986) (citing *Allstate Ins. Co. v. Neumann*, 435 N.E.2d 591, 594 (Ind. Ct. App. 1982)). Underwriters argues that Jerid "has not satisfied its burden in presenting evidence that the loss was caused by lighting" and was therefore covered under the policy. [DE 32 at 9]. As support for this proposition, Jerid proceeds to emphasize the strength of its own evidence, particularly the lightning strike reports, and to attempt to poke holes in and discredit the opinions of the plaintiff's witnesses, Mohajeri and Gaitan.

Underwriters are not entitled to summary judgment. The Court disagrees with Underwriters' statement that Jerid has not presented evidence that the loss was caused by lightning. When *Celotex*

and other cases say the nonmoving party must "make a showing sufficient to establish the existence" of each element on which that party will bear the burden, it does not mean the party must meet the standard of proof which will apply at trial – in a civil case, a preponderance of the evidence – just to defeat summary judgment. It simply means that the nonmoving party must show the existence of a "genuine issue of material fact" as to each element, such that a reasonable jury which believed the nonmovant's version of the evidence could find in his favor. *See, e.g., Valentine v. Joliet Tp. High Sch. Dist. No. 204*, 802 F.2d 981, 986 (7th Cir. 1986) (on summary judgment, trial court need only decide "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.") (quoting *Anderson*, 477 U.S. 242). That is the dispositive question, here: whether Jerid has created a "genuine issue of material fact" with respect to lightning as the cause of collapse.

At the outset, there is no doubt that an "issue of fact" exists. The entire dispute between the parties is over the cause of collapse, and "when there is more than one possible cause of an otherwise insurable [loss], it generally is a question of fact as to what the predominant cause of the [loss] was[.]" *Keckler v. Meridian Sec. Ins. Co.*, 967 N.E.2d 18, 23 (Ind. Ct. App. 2012). There is also no doubt that the issue is "material." Not only does it "*affect* the outcome of the suit[,]" *Anderson*, 477 U.S. at 248 (emphasis added), it determines it. The only remaining decision the court must make is whether the issue is "genuine." An issue of fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. That requires more than mere "selfserving assertions." *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 415 (7th Cir. 2005). To successfully create a genuine issue, "the nonmovant must

present definite, competent evidence in rebuttal." *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 998 (7th Cir. 2002) (citing *Vukadinovich v. Bd. of Sch. Tr. of N. Newton Sch. Corp.*, 278 F.3d 693 (7th Cir. 2002)). Furthermore, although it is more often discussed in the context of a Rule 50(a) motion, it stands to reason that a nonmovant cannot rebut a summary judgment motion with evidence that is "legally incredible[,]" in that "it must have been based on an event that was 'physically impossible for the witness to observe ... or [it was] impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. Brooks*, 125 F.3d 484, 495 (7th Cir. 1997) (quoting *United States v. Henderson*, 58 F.3d 1145, 1149 (7th Cir. 1995)). After all, no reasonable jury could base its verdict on such evidence. Finally, the court notes that "[i]n cases involving simple issues but highly disputed facts (an apt description of this case), greater deference should be afforded [to the factfinder]." *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995) (parenthetical original, but still applicable to this case).

Jerid's evidence passes all of these tests and creates a genuine issue. The reports and depositions of Mohajeri and Gaitan are definite, competent evidence which lend support to Jerid's lightning strike theory. Mohajeri's report, in particular, is thorough and well-supported, and the evidence shows he is credentialed in his field. True, Underwriters' engineers have a different opinion of what caused the collapse, but the court does not weigh the evidence or assess the credibility of witnesses at the summary judgment stage. *Valentine*, 802 F.2d at 986. Instead, the court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. In short, it makes no difference whether Donan engineers disagree with Mohajeri, so long as a reasonable jury could agree with him. Underwriters offer no compelling reason why a reasonable jury could not. The two

main arguments are (1) that the "lightning strike reports" make it somehow impossible for Jerid to persuade a reasonable jury that lightning caused the collapse and (2) that Mohajeri and Gaitan both admitted that if they were presented with evidence that proved rot caused the collapse, they would change their opinion.

Neither is a good argument. With respect to the former, Underwriters overestimate the importance of the probability evidence they possess in the form of the lightning strike reports. The reports do not preclude a reasonable jury from believing Mohajeri and Gaitan, nor do they make those witnesses' testimony "legally incredible." First, the lightning strike reports only cover two days in September. It is not at all essential to the plaintiff's case that the lightning strike occurred on September 13th or 14th. To the contrary, it makes no difference when it happened, so long as it happened. A reasonable jury could find Mohajeri's forensic analysis of the collapsed area – tar bubbles, drain fragments and all – persuasive, and conclude that lightning must have struck at some point in September, all without contradicting the lightning strike reports in any respect. Moreover, the reports' depictions of the range of possible locations for a lightning strike are accurate to only a 99% degree of probability. That is certainly nothing to scoff at, but it does not make an event to the contrary physically impossible, even on the two days out of the month that are covered by the report.

The latter argument, concerning the chance that the witnesses might change their minds, is similarly unpersuasive. It is difficult to see why the possibility that a witness might change his mind if presented with contrary evidence would have any bearing on the matters presently before the Court, given that the witnesses have not actually changed their minds yet. The question is whether a jury presented with the evidence *currently in the record* could find for the nonmovant, not whether

a jury presented with a hypothetical, different set of evidence in which the plaintiff's witnesses have changed their minds could find for the nonmovant. At this time, Jerid has provided evidence of a lightning-caused collapse which a reasonable jury could believe, regardless of whether Underwriters have also provided competing evidence of a rot-caused collapse or evidence which makes a lightning strike on a pair of days, in particular, very unlikely. As a result, the crucial issue in this case is a simple, but hotly contested, genuine issue of material fact, perfect for a jury and inappropriate for resolution on summary judgment. Underwriters' motion is **DENIED**.

## II.  Jerid's Motion

Jerid's motion for summary judgment is essentially the opposite of Underwriters' motion. Jerid asks the court to determine that no genuine issue of material fact exists with respect to the cause of collapse, and to therefore conclusively determine that the collapse was the result of a lightning strike. Jerid's motion must be denied for the same reasons Underwriters' motion was denied: there *is* a genuine issue of material fact at the center of this case, which the court will not resolve on summary judgment. Flipping the positions of the parties so that Underwriters gets the benefit afforded the non-movant, the question becomes whether any reasonable jury could conclude that the collapse was *not* the result of a covered cause of loss. Certainly, a reasonable jury could so conclude. Underwriters has presented reports by two separate engineers with backgrounds in forensic work, one of whom (Woodall) is a forensic electrical engineer familiar with the effects of fire and lightning. Woodall testified at deposition and explained in his report that he did not believe the collapse could have been caused by lightning: he found no burning or charring or smoke stains; there was no damage to the electrical systems in Building 5; and he did not believe the scattered tar bubbles were symptomatic of a lightning strike. Rupnow made the same observations. Both also

16

advanced an alternative cause of collapse: rot. Obviously, evidence that rot caused the collapse could help persuade a jury that lightning did not cause the collapse. There is no reason to recite, once again, the standard for a "genuine" issue of fact. Underwriters' showing clearly meets it. Jerid's motion is **DENIED**.

## CONCLUSIONS

For the reasons stated, Jerid's motion for summary judgment [DE 30] and Underwriters' motion for summary judgment [DE 31] are **DENIED**. The court will contact counsel to set a scheduling conference so that this case may proceed to trial.

SO ORDERED.

ENTERED:  September 17, 2012 

                                                                               /s/ JON E. DEGUILIO  
                                                                              Judge  
                                                                              United States District Court